UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No.: 1:22-cr-00302(DLF) |
| | : | |
| LAWRENCE LOUIS AMBROSE | : | 40 U.S.C. § 5104(e)(2)(G) |
| | : | Parading, Demonstrating, or Picketing in a |
| | : | Capitol Building |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Lawrence Ambrose to 21 days incarceration, 60 hours community service, and $500 restitution.

**I.    Introduction**

Defendant Lawrence Ambrose, 55, a full-time house car driver for a hotel chain in Southern California participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on October 25, 2022, (ECF No. 9 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

Defendant Ambrose pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because (1) Ambrose was present in the Capitol for a significant period of time, (2) Ambrose was present when Ashli Babbitt was shot near the entrance to the House floor, and was present for the violence and police confrontations there, (3) was fist pumping in the Speaker's Lobby and (4) Ambrose was present, for a short period, in the Speaker of the House's suite of offices.

The Court must also consider that Ambrose's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Ambrose's crime support a sentence of 21 days incarceration, 60 hours community service, and $500 restitution.

**II.     Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 9 (Statement of Offense), at 1-7.

*Defendant Ambrose's Role in the January 6, 2021 Attack on the Capitol*

Ambrose traveled from San Diego to Washington D.C. to attend the rally on January 6, 2021 January 5, 2021, with a return flight on January 7, 2021.

Ambrose entered the Capitol through the Senate Wing door at approximately 2:24 p.m.



At this time, the windows surrounding the Senate Wing door had been broken, and there was glass on the ground at the entrance. At approximately 2:31 p.m., Ambrose had made his way up a level and was walking around near the Rotunda, and near Speaker Pelosi's Office suites.



A short time later, Ambrose entered the outer room of one of Speaker Pelosi's offices.



At approximately, 2:34 Ambrose had made his way to the Rotunda on the second floor of the U.S. Capitol. From there, Ambrose walked through Statuary Hall. Ambrose walked near the Main Entrance to the House of Representatives when they were locked down. The image below shows the officers on the other side of the Main Entrance.



From that hallway, Ambrose walked to the area near the Speaker's Lobby of the House of Representatives. At approximately 2:45, Ambrose was present when Ashli Babbitt attempted to climb into the House of Representatives and was shot.



Immediately prior to her shooting, Ambrose was present in the Speaker's Lobby during the confrontation between rioters and police, and can be seen fist pumping as the police leave the Speaker's Lobby.



Ambrose was also present when the Speaker's Lobby windows were smashed after police left.



After the shooting, rioters were forced out by law-enforcement and Ambrose exited at approximately 2:54 through the Upper House door.



Mr. Ambrose was in the U.S. Capitol for approximately 30 minutes.

*Defendant's Interview*

Mr. Ambrose was initially interviewed on March 30, 2022. Prior to the interview, Ambrose brought his current phone to the FBI to be reviewed, despite the fact that it was acquired after the events of January 6, 2021.

Ambrose admitted that he knew that the Capitol was a restricted building and was not open to the public, and that there were politicians inside the Capitol conducting a meeting to make the election official.

During his interview, Ambrose did not mention that he was present when Ashli Babbitt was shot. After the government learned of that fact, it sought a second voluntary interview and Ambrose agreed. During the second interview, Ambrose admitted being present at the scene of the shooting.

*The Charges and Plea Agreement*

On September 13, 2022, the United States charged Ambrose by criminal information with violating 40 U.S.C. § 5104(e)(2)(G). Ambrose turned himself in on or about October 4, 2022. On

6

October 25, 2022, pursuant to a plea agreement, Ambrose pleaded guilty the Information charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).  ECF No. 8 and 9.  By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Ambrose now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).   As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days incarceration, 60 hours community service, and $500 restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy. *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of

federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Ambrose's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Ambrose, the absence of violent or destructive acts is not a mitigating factor. Had Ambrose engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Ambrose's case is the violence he observed: the shooting of Ashli Babbitt as well as the conflicts with law enforcement that he observed. The defendant's presence and fist pumping encouraged the violence that took place in the Speaker's Lobby area. Ambrose admits as much when he states he is guilty of "providing moral support (with my presence) to those who did much worse inside the Capital." Draft PSR, ¶ 21 (a).

Another important factor is the sensitive places Ambrose visited during his unlawful entry into the Capitol. Ambrose went into Speaker Pelosi's private office space and the Speaker's Lobby. In addition, Ambrose walked directly past the entrance to the House of Representatives as they were locked down to protect them from the rioters, including of course Ambrose. Ambrose joined others who had pushed past law-enforcement to go deeper into the U.S. Capitol to areas that were further off limits.



Ambrose spent approximately 30 minutes in the U.S. Capitol on January 6, 2021, longer than many § 5104(e)(2)(G) cases. Ambrose entered through the Senate Wing door, made his way to Speaker Pelosi's office suite area, through the Rotunda, through Statuary Hall, to the area outside the entrance to the House of Representatives, to the Speaker's Lobby, and eventually out through the Upper House door. He entered the Capitol after others had breached the Building. The defendant undoubtedly saw signs of damage; CCTV video reveals that other rioters had smashed the windows in at the Senate Wing door and the door had been forced open. These things did not cause him to exit the Capitol. Of greater magnitude, he witnessed aggression towards the police officers at the Speaker's Lobby, saw the destruction of property by rioters, and saw the shooting of Ashli Babbitt.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Ambrose

Ambrose is a high school graduate who is gainfully employed, and has been at his current job for approximately ten years. He is a homeowner. According to the pre-sentence report, Ambrose has no drug or alcohol issues. There is no indication in the record that anything prevented him from knowing that what he was doing was wrong

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The defendant, through counsel, immediately accepted responsibility for his conduct. Additionally, Ambrose, with counsel, meet with the government on two occasions although there was no requirement that he do so.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Ambrose based on his own conduct and relevant characteristics, but should

---

[2] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Ambrose has pleaded guilty to Count 1 of the Information charging him with violating 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

**Non-Guidelines Cases**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section

3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed,

13

and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his

exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Speaker's Lobby, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

In *United States v. David Mish*, 1:21-CR-00112-CJN, the defendant pleaded guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) in connection with penetrating the Capitol building all the way to the Speaker's Lobby where Ashli Babbitt was shot. Judge Nichols sentenced the defendant to $500 restitution and 30 days incarceration. Unlike Ambrose, Mish proactively assisted law enforcement, and contacted the MPD on January 7, 2021 with information about the shooting of Ashli Babbitt. *See also United States v. Rasha Abual-Ragheb*, 1:21-CR-

00043-CJN (Speaker's Lobby), *United States v. Andrew Bennett*, 1:21-CR-00227-JEB (same), *United States v. Jeffrey Register*, 1:21-CR-00349-TJK (same), *United States v. Iraj Javid*, 1:22-CR-00077-BAH (same).

In *United States v. Robert Packer*, 1:21-CR-00103-CJN, the defendant pleaded guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) in connection with penetrating the Capitol building all the way to the Speaker's Lobby where Ashli Babbitt was shot. Judge Nichols sentenced the defendant to $500 restitution and 75 days incarceration. Though Packer had an aggravating factor not present here -- he wore a distinctive sweatshirt with "Camp Auschwitz" and "Work Means Freedom" on the front and the word "Staff" on the back -- Packer was, like Ambrose, part of the mob that "was shouting and pushing police to make their way up to the Rotunda and Statuary Hall" from the Crypt. *Packer*, 1:21-CR-00103-CJN, ECF No. 44, pg. 12.

The government's review of sentenced defendants also reveals at least two additional defendants sentenced as misdemeanants (although for Class A offenses) who were also present in the Speaker's Lobby when Ashli Babbit was shot. *See United States v. Lawrence Baranyi*, 1:21-CR-00062-JEB (18 U.S.C. § 1752 (a)(1) 90 days' incarceration, 12 months' year supervised release, $500 restitution); *United States v. Phillip Bromley*, 1:21-CR-00250-PLF (18 U.S.C. § 1752 (a)(2) 90 days' incarceration, 12 months' year supervised release, $2000 restitution, $4,000 fine).

Another defendant who entered an office space, Tam Dinh Pham, received a sentence of 45 days' imprisonment. *United States v. Tam Dinh Pham*, No. 21-cr-109 (TJK). While Pham was an active-duty police officer who downplayed his conduct to the FBI, other facts of his case resemble Ambrose's: he saw confrontations between rioters and police before entering; he yelled "we're taking the house back!," and he was inside the building for approximately 20 minutes.

16

Another defendant who entered an office space, Matthew Mazzocco, also received a sentence of 45 days' imprisonment. *United States v. Matthew Mazzocco*, No. 1:21-cr-00054 (TSC). Although in the Capitol Building for only 12 minutes, *Mazzocco* made his way into both the Crypt and the Spouse's Lounge, he timely admitted to his actions and accepted responsibility, his social media posts indicated that he understood and concurred with the disruption of the Congressional proceedings, and he had no criminal record.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 21 days incarceration, 60 hours community service, and $500 restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ James D. Peterson*
      JAMES D. PETERSON
      Trial Attorney
      VA Bar No. 35373
      United States Department of Justice
      1331 F St. NW 6th Floor
      james.d.peterson@usdoj.gov
      Desk: (202) 353-0796
      Mobile: (202) 230-0693

**CERTIFICATE OF SERVICE**

    On this 6th day of March, 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:   */s/ James D. Peterson*
      JAMES D. PETERSON
      Trial Attorney
      VA Bar No. 35373
      United States Department of Justice
      1331 F St. NW 6th Floor
      james.d.peterson@usdoj.gov
      Desk: (202) 353-0796
      Mobile: (202) 230-0693